UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LISA QUINTERO,

        Plaintiff,                            Hon. Ellen S. Carmody

v.

                                              Case No. 1:18-cv-814

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

# PROCEDURAL POSTURE

Plaintiff was 32 years of age on her alleged disability onset date. (PageID.223). She successfully completed two years of college and worked previously as a registered nurse. (PageID.53, 281). Plaintiff applied for benefits on July 29, 2015, alleging that she had been disabled since December 15, 2008, due to bi-polar disorder, borderline personality disorder, anxiety, post-traumatic stress disorder (PTSD), asthma, pinched nerve in her neck, gastroesophageal reflux disease (GERD), and hypothyroidism. (PageID.223-35, 280).

Plaintiff's applications were denied initially after which she requested a hearing before an Administrative Law Judge (ALJ). (PageID.114-221). On September 8, 2017, Plaintiff appeared before ALJ Richard Horowitz with testimony being offered by Plaintiff and a vocational expert. (PageID.61-112). In a written decision dated January 30, 2018, the ALJ determined that Plaintiff was not disabled. (PageID.38-55). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.26-30). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 2015. (Tr. 41). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

# ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.

---

[1]
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

*See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) obesity; (2) asthma; (3) right Achilles tendon rupture post-surgery; (4) mild bilateral median neuropathy; (5) minor cervical degenerative changes; and (6) mental impairments variously described as depression, anxiety, PTSD, borderline personality disorder, alcohol abuse, and cannabis abuse, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.41-44).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can occasionally use right foot controls; (2) she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; (3) she can frequently balance and stoop and occasionally kneel, crouch, and crawl; (4) she can occasionally work in conditions of humidity or wetness, where there is concentrated exposure to dust, odors, fumes, or other pulmonary irritants, in extreme cold and heat, and where there are vibrations; (5) she can occasionally reach overhead with both arms, and frequently reach in all other directions with both arms; (6) she can frequently handle and finger with the bilateral hands; (7) she can never work around hazards, such as unprotected heights or around moving mechanical parts; (8) she is limited to simple, routine, and repetitive tasks but not at a production rate pace (e.g., no assembly line work); (9) she is limited to making simple, work-related decisions; (10) she can respond appropriately to occasional interaction with

supervisors and co-workers, with no team or tandem work with co-workers, and no interaction with the general public; (11) she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and (12) any work changes need to occur infrequently and be adequately and easily explained. (PageID.44-45).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed more than one million jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.104-09). This represents a significant number of jobs. *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed

'significant'"). The vocational expert further testified that if Plaintiff were further limited to sedentary work, there still existed approximately 324,000 jobs which she could perform. (PageID.110).

I. **Medical Evidence**

In addition to the testimony presented at the administrative hearing, the administrative record contains copies of Plaintiff's statements and medical treatment records. The ALJ described this evidence as follows:

> In terms of her asthma, the record showed that she uses [an] inhaler (5F/l-2). In February 2010, she had complaints of shortness of breath. However, imaging was normal (4F/41). By November 2014, the claimant sought treatment for cough and sinus pressure (6F/3). Examination showed abnormal breath sounds with no rales, or rhonchi. A moderate, diffuse wheeze was noted (6F/4). By February 2015, the record noted that her asthma was moderately persistent, but uncomplicated (7F/4). In September 2015, she reported that she wanted to quit smoking and was afraid she had lung cancer. However, she was not using nicotine patches that she already had been given and she refused to see her primary care physician for this condition (11F/2-6). By November 2015, the record noted that she had a history [of] asthma but she had not been treated for it within the past twelve months (14F/40). Imaging from August 2017 showed no acute or new chest pathology (20F/7-8).
>
> In terms of any other physical complaints, in December 2012, she sought treatment at the emergency room for foot pain after kicking a door. She had a contusion and imaging was obtained, which was unremarkable (15F).
>
> In October 2013, she had complaints of neck pain, recently worsening. She reported that it was left sided with burning pain on the back of her neck with specific movements. There was no radiation. Physical examination showed some slight wheezes, some swelling/tenderness of the skin of neck and tenderness of the posterior aspect of the neck at C6-C7 (6F/7).
>
> In November 2015, she indicated that she had no physical concerns and no chronic pain (14F/41).

In June 2016, she sought treatment for right lower leg/ankle pain. On examination of the right, lower extremity there was obvious palpable defect at the Achilles calcaneal tendon insertion site. There was no plantar flexion. She was able to dorsiflex, but unable to plantarflex. She had good sensation in the toes and good pedal pulses. Her knees and hips were unremarkable (16F/18). Imaging was normal; she was diagnosed with a ruptured tendon (16F/18-21). She then attempted some physical therapy, but eventually underwent right ankle surgery in July 2016, without complication (17F, 19F/l0-11). Just over two weeks after the procedure, the claimant was able to walk without an assistive device (18F/48).

She sought treatment in April 2017 reporting that she had neck pain and her arms felt tingly. She denied weakness or any difficulty using them. Examination showed her grip[s] were normal bilaterally with full range of motion and no diminished sensation (16F/10, 15F/65-67). Imaging showed mild reversal of the normal curvature the cervical spine, centered at the C4-C5 level and minor hypertrophic degenerative changes at the C4-C5 level, possibly related to muscle spasm. It was otherwise an unremarkable study of the cervical spine (16F/8, 18F/74). No acute intracranial abnormality was found (16F/15).

She also had an electromyogram study done in May 2017, which showed electrophysiological evidence compatible with mild demyelinating injury to the median motor nerve in the right carpal tunnel with electrophysiological evidence compatible with mild demyelinating injury to the median motor nerve in the left carpal tunnel. There was no significant electrophysiological evidence of ulnar neuropathy in the upper extremities or acute cervical radiculopathy (18F/70).

She attended some physical therapy for her back, neck and arm pain from June until September 2017 (20F). Records indicated that after sixteen interventions, she continued to have complaints of neck and spinal pain occasionally but it was decreased. The radicular symptoms to her arm had mostly resolved (20F/l 13).

In addition to the foregoing, the claimant is obese. The claimant reported that she is five feet three inches and weighed 190 pounds, for a body mass index over 33 (Testimony). While the level of obesity does not establish whether the obesity is or is not functionally limiting for the disability program purposes, the

combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately (SSR 02-1p). Accordingly, the claimant's obesity causes limitations that are reflected in the above residual functional capacity.

Based on the foregoing, the undersigned finds the claimant's physical impairments are adequately accommodated by limiting her to light work with additional postural, manipulative, and environmental limitations. Specifically, as discussed above, the claimant has a history of asthma. However, this is accommodated by limiting her to light work with additional environmental limitations. She has little treatment for this condition and imaging showed no chest pathology during the relevant period, but she does use an inhaler. In terms of her other impairments, those are accommodated by limiting her to light work with additional postural and manipulative limitations. Specifically, she reported no physical concerns or chronic pain in November 2015 and the record generally supports this before she ruptured her Achilles tendon in June 2016. After that, she had a procedure on her ankle and also had some neck and back pain. However, after physical therapy, she reported moderate improvement in her symptoms. Moreover, additional procedures, like injections, were not advised. Finally, as discussed above, the claimant is capable of many activities of daily living, which suggest she is able to function at least in the light range of work. Accordingly, the undersigned finds the above residual functional capacity reflects the most the claimant could do on a sustained basis, and nothing in the record suggests the claimant has further limitation.

In terms of the claimant's mental impairments, she has a history of depression before the relevant period (9F/77). In January 2009, she began an inpatient detox program (9F/74). She was discharged after successful completion of treatment from alcohol withdrawal (9F/147). She had minimal treatment after this encounter. However, by May 2010, the record showed the claimant had completed another inpatient rehabilitation program. After that, she went home and she overdosed on a bottle of Ativan and also tried to cut herself with a knife (1F/13). She was promptly admitted overnight for treatment for bipolar disorder and hypermania (IF/2). She was discharged to outpatient treatment with instructions to follow up with a therapist and a psychiatrist for outpatient care. Her prognosis was guarded but she was in a better mood; she was aware she had bipolar disorder and felt medication was not the answer to her problem. She had, in the past, been self-medicating with multiple

medications (1F/3). Physical and neurological examinations were normal (1F/6). Mental status examination notes showed she was a bright young woman whose language reflected her level of intellect. She summarized very well what was going on with her and she volunteered and answered questions but held and hid her feelings. Discharged noted indicated (sic) that she was very afraid of expressing anger but then she blew up periodically and when she did, she lost control. With her loss of control she either self-harms, cuts [her]self, or she would overdose on alcohol, which potentially was hazardous for her because she did that in the presence of males who were predatorial. She felt helpless, hopeless, and useless and had feelings of low self-esteem and worthlessness (1F/6).

She then went to jail for alcohol related charges in July for thirteen days. She was re-arrested in September 2010 (3F/32). Treatment notes during her incarceration indicated that her appearance was unremarkable and she was oriented. Her psychomotor was observed to be tense and ridged but her judgment was good. Her speech was unremarkable and her affect was restricted. Her concentration and attention were good. Her thoughts were circumstantial, coherent, and organized (3F/7). Her affect was constricted with a stable, mildly depressed mood and no major swings recently. She was motivated for treatment but requested medication adjustment. She was anxious and not sleeping well due to adjustment and anxiety. Her judgment appeared to be grossly intact with thoughts of getting out soon but feeling very anxious. Her alcohol dependence was in remission. She had a cooperative attitude with no suicidal ideas, plan or intent (3F/7).

Other notes from October 2010 showed she was in the general population with no referral to health care services or mental health or substance abuse counseling (2F/28, 49). Otherwise, she was doing well and had adjusted to jail (3F/9). Her release date was scheduled for October 21, 2010 (Id.).

By December, the record noted she was again incarcerated for alcohol use following her initial alcohol legal issues (3F/11, 35). In January 2011, while in jail, the record noted that she was well groomed, with unremarkable speech and psychomotor. Her affect was constricted and her mood was depressed. She was oriented with grossly intact judgment and she was cooperative and motivated. After being in remission for fourteen days, she was stable (3F/13).

By April 2011, the record noted that she went to rehabilitation in Alpena for 60 days, instead of completing a longer prison sentence. She was then released to a halfway house before being released to home (3F/38). Examination notes showed that she was alert and cooperative. Eye contact was direct. She appeared euthymic. Her cognition was intact. There was no evidence of psychotic mental content or thought processes. There was no evidence of suicidal ideation. She was not using alcohol or drugs. The record noted that she continued to take some medications, but had run out of others (3F/38). She also missed some scheduled appointments (3F/39).

At her next appointment, in June 2011, she was drinking beer again and she was not attending her counseling services for substance abuse. The record also noted that she was not taking her medications; she claimed she could not afford them (although she continued to drink beer). Examination notes indicated that she appeared to be polite and fairly tidy but cooperative. Her face appeared to be puffy and she was tearful at times and had gained weight over the past few months. Her affect appeared to be eliciting indifference and apathy at times and she was moderately depressed. Her mood was moderately anxious. She denied any current suicidal or homicidal ideation, intent or plan. Her judgment was poor and her insight was limited, especially with regards to her ongoing substance abuse (3F/40).

In July, she reported that things had been going relatively well as far as her mood went. She had not been persistently depressed. She was sleeping adequately at night. She reported that she still drank two to three 24-ounce beers per day, but this was about half of what she was previously drinking. She did not experience any blackouts on this. She was observed as a neatly dressed and groomed, polite woman who was articulate and intelligent. Her overall mood appeared neutral. She showed a fairly good range of affect. There were no abnormal involuntary movements. She had a good memory of recent events. She had insight into her alcoholism but continued compulsively drinking (3F/45).

In October 2011, she indicated that she was doing relatively well and her mood was stable, although she continued to drink. She reported that she was looking for a job and working with someone from vocational rehab. The record noted she continued to be noncompliant with her medications (3F/47).

She went without treatment for over a year. Then in February 2013, she sought treatment at Community Mental Health for Central Michigan. The record noted that she meet the criteria for Borderline Personality Disorder in that she had made frantic efforts to avoid abandonment. She had a long history of unstable relationships, she has self-harming behaviors, and she has threatened suicide multiple times when angered or upset. She engaged in anger outbursts, she had severe dissociative symptoms whereas she would consume substances and/or engage in other impulsive behaviors to self-medicate her circumstances. She did appear to have a positive sense of self, she was able to reflect upon her past decisions, and she wanted to work towards change. Her anger was also easily attributable to past traumas (5F/75-76).

Notes from May 2013 showed she was doing well, but some medication changes were made (8F/70). The record also noted that she was working at the Kettunen Conference Center as a kitchen helper about eight to twenty-four hours per week (8F/67). By August, the record noted she had not been doing well since her last appointment. Nonetheless, she continued to work the same jobs and the same number of hours. Her medication was again adjusted and the claimant was encouraged to continue working and abstain from alcohol (8F/65).

In February 2014, the record noted that the claimant had run out of medication several months previously but started to take old, left over medications she had from before her medication adjustments. She continued to drink daily and use marijuana as often as she could get it (8F/58). She was doing ok since her last appointment but had not been seen for six months due to her "simply not showing up for her appointments." She also lost her job of nearly a year for inebriation (8F/56). The record noted her mood symptoms did not meet full criteria for bipolar disorder based upon the short duration of the episodes. In addition, she had not experienced any psychotic symptoms during these episodes nor has she been hospitalized due to one of these episodes. Moreover, her long history of abusing substances made it possible that some of her symptoms were substance induced. She had some anxiety symptoms which did not meet the minimum criteria for the various psychiatric disorders so her symptoms were considered Anxiety Disorder (not otherwise specified) at this time (8F/60).

By June 2014, the record noted that the claimant began working as a bartender (8F/38). In November, the record noted that she stopped

taking her psychotropic medications about a week before she was arrested again, this time for assault and violation of probation for drinking alcohol (8F/32). The record noted that she had been very inconsistent with her medications and she would likely get more benefit from her medications with better compliance. She was encouraged to exercise regularly (8F/36).

By March 2015, the record noted that she was doing well and her moods have been good; she had no main concerns (8F/14). She reported that she had not used alcohol since before going to jail over seven months before and she was taking her medications consistently (Id.). Mental status examination showed she was friendly and cooperative. She had a normal gait with no abnormal movements; she was not restless. Her speech was spontaneous and her mood was "real good". Her affect was semi-bright. Her thought process was linear and she was alert with no evidence of internal stimuli. Her memory was grossly intact and he insight and impulse control were fair to poor (8F/l7).

By July, the record remained largely unchanged. She was doing well and had been busy doing gardening. Her moods were "pretty stable". Mental status examination notes showed her impulse control and insight were fair, all other areas remained unchanged (8F/5). In September 2015, the record indicated that the claimant was "sad" and she had concerns regarding poor memory. Again, the record indicated that she had missed some medication dosages (11F/2).

In November 2015, a closing report from the Community Mental Health for Central Michigan indicated that she had been charged with domestic violence multiple times and all of her charges were all obtained while she was under the influence of alcohol. Nevertheless, she continued to drink up to eight beers daily as well as some vodka (14F/32). It further noted that she had mood and anxiety problems, which were exacerbated by longstanding substance use problems (14F/7). She was no longer self-harming, but there were concerns about drinking and driving (14F/29). She wished to close her file in part because she had accomplished all aspects of probation except paying her fines (14F/8). The record also noted that she could be impulsive and aggressive at times, but she was able to maintain employment for nine months during her treatment and did not impulsively walk out (14F/27). Her daily living skills were all rated as either independent or needs a verbal prompting (14F/37-38).

A mental status examination for discharge indicated that she was disheveled but oriented. She had average intellectual functioning with normal thought process. Her thought content was relevant without hallucination. She had appropriate behavior and affect. Her judgment was within normal limits, although there was impulsivity notes as it related to drinking. She had some decreased energy and appetite with some trouble sleeping (14F/43-44).

She then sought treatment for complaints of bipolar disorder in April 2016. She was prescribed medication and advised to return in two months (18F/30-32). She returned four months later, in August, complaining of anxiety. She reported she was off her medications. She also reported moderate relief when she adhered to treatment (18F/51). Examination notes showed her mood appeared anxious. Her affect was labile. Her speech was rapid and/or pressured. She was agitated. Her cognition and memory were normal. She expressed impulsivity. She expressed no homicidal and no suicidal ideation (18F/53). She returned to the emergency room about two weeks later and reported improvement with medication (18F/55).

(PageID.46-51).

## II.     Plaintiff's GAF Scores

Plaintiff argues that she is entitled to relief because the ALJ "discounts the various GAF scores throughout the record." As the Sixth Circuit has recognized, a GAF score "may help an ALJ assess mental RFC, but it is not raw medical data." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 503 n.7 (6th Cir., Feb. 9, 2006). Accordingly, the ALJ is not required "to put stock in a GAF score in the first place." *Id.* at 511 (citing *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002)). Thus, the ALJ's failure to afford significant weight to Plaintiff's GAF scores does not constitute error. Moreover, the record reveals that when Plaintiff properly takes her medication she is capable of functioning consistent with the ALJ's RFC assessment. That Plaintiff may have experienced diminished levels of functioning at discrete moments in time, as reflected by certain GAF scores, does not undercut or

diminish the ALJ's assessment of the medical evidence or his ultimate conclusion that Plaintiff is not entitled to disability benefits.   This argument is, therefore, rejected.

**III.     Listing of Impairments**

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled.   Plaintiff argues that the ALJ incorrectly determined that she did not meet the requirements of Sections 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or 12.08 (personality and impulse-control disorders) of the Listings.   While each of these Listings concerns different impairments, each Listing requires the claimant to satisfy certain "A" criteria as well as certain "B" or "C" criteria. The ALJ did not specifically address the A criteria for these Listings, but instead concluded that Plaintiff could not satisfy the B or C criteria and, therefore, could not satisfy any of the Listings in question.

To satisfy the B criteria for these Listings, Plaintiff has to demonstrate that she experiences "extreme" limitation of one, or "marked" limitation of two, of the following areas of functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.   20 C.F.R., Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06, and 12.08.   To satisfy the C criteria for Listings 12.04 and 12.06[2], Plaintiff must demonstrate that her mental illness is "serious and persistent" with evidence of both: (1) ongoing treatment which diminishes her symptoms, and (2) "minimal

---

[2] Section 12.08 of the Listings contains only A and B criteria.   20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.08.

capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R., Part 404, Subpart P, Appendix 1, §§ 12.04 and 12.06.

In support of his conclusion that Plaintiff did not satisfy either the B or C criteria of these Listings, the ALJ discussed at length the relevant evidence and how such supported his conclusion. (PageID.41-44). The ALJ's conclusions are supported by substantial evidence. In support of her argument that she is entitled to relief, Plaintiff simply invites the Court to re-weigh the evidence and reach a different conclusion. Aside from the fact that the Court cannot re-weigh the evidence, Plaintiff's argument falls well short of satisfying her burden to demonstrate that she meets a Listing. *See Malone v. Commissioner of Soc. Sec.*, 507 Fed. Appx. 470, 472 (6th Cir., Nov. 29, 2012) (claimant bears the burden to demonstrate that she satisfies the requirements of a listed impairment). Accordingly, this argument is rejected.

## IV. Plaintiff's Drug and Alcohol Use

As the ALJ recognized, Plaintiff has struggled with drug and alcohol abuse. Plaintiff argues that she is entitled to relief because the ALJ failed to "make a determination on the record whether [her drug and alcohol abuse] is or is not material in this matter." A claimant "shall not be considered to be disabled" if "alcoholism or drug addiction" is found to be "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). As Defendant correctly notes, however, the ALJ only needs to consider the materiality of a claimant's drug and alcohol use if he first finds the claimant disabled. *See, e.g., Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 380 (6th Cir. 2013) (the ALJ "never found Gayheart to be disabled at all, thus precluding the need to assess the materiality of alcohol abuse"). Here, the ALJ did not find Plaintiff disabled. Accordingly, this argument is rejected.

16

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: July 22, 2019 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge